**W. E. HEDGER TRANSP. CORPORATION v. HART.**

**HART v. THE BRIMSTONE et al.**

**THE A. J. RUDDY.**

**THE M. A. LENAHAN.**

**THE BRIMSTONE.**

**THE FORT ASH.**

No. 267, Docket 20588.

Circuit Court of Appeals, Second Circuit.

July 9, 1947.

Max Taylor, of New York City (J. Vincent Keogh, U. S. Atty., and Gordon L. Becker, all of New York City, on the brief), for appellant.

John A. Lyon, of New York City (Platow & Lyon and Edward F. Platow, all of New York City, on the brief), for appellees.

Before CHASE, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This appeal arises out of a collision between the respondent-appellant's steamship "Fort Ash" and the libellant's flotilla comprised of the tug "Brimstone," towing the barge "M. A. Lenahan" on her port, and the barge "A. J. Ruddy" on her starboard, side. The collision occurred at about 7:20 a. m. on April 23, 1945, in the East River just east of North Brother Island. The District Court found that previous to the accident the "Brimstone" was proceeding in a general easterly direction on the starboard side of the channel between North Brother Island and South Brother Island. Approaching the "Brimstone" from the opposite direction were the steamship "Ferncliffe," with the escorting tug "W.S.A. No. 10" on her portside, and the steamship "Fort Ash," which was behind these two. The District Court found that the "Brimstone" sighted the "Fort Ash" about a mile away in the channel north of North Brother Island. About that time the "Fort Ash" left the northerly channel and headed toward the channel between the two islands. The "Brim-

stone," then entering the channel, signalled for a port-to-port passage by blowing one whistle. Hearing no answer from the "Fort Ash," the "Brimstone" later blew another one whistle, and finally an alarm, and commenced backing. Nevertheless the bow of the "Ruddy" came into contact with the starboard bow of the "Fort Ash." As a result of the collision the "Ruddy" sank in her own fairway within a few minutes.

There was testimony from the "Fort Ash" that she had four times blown the two-whistle signal for a starboard-to-starboard passage and that just previous to the accident the "Brimstone" had swerved to starboard into the fairway of the "Fort Ash." The District Court rejected this testimony, however, relying heavily on the testimony of the disinterested witness Soderberg, master of the tug "W.S.A. No. 10." The court specifically found that the "Brimstone" had not changed her course prior to backing. On the question of the exchange of signals it said that it accepted the version of the "Brimstone"; in addition, it found that the "Fort Ash's" starboard whistle cord was defective.

The owner of the "Brimstone" and her tow filed a libel against the master of the "Fort Ash" for damages to its vessels, and the master of the "Fort Ash" filed a cross libel in rem against the "Brimstone." The District Court entered an interlocutory decree in the libel finding the "Fort Ash" solely at fault and it dismissed the cross libel. The A. J. Ruddy, D.C.E.D.N.Y., 69 F.Supp. 268. From this decree the respondent-cross-libellant appeals.

The facts found by the District Court are amply supported by the evidence, and on those facts the court's conclusion properly followed. The "Brimstone's" signals and movements upon sighting the "Fort Ash" were entirely correct. Having signalled for a proper port-to-port passage, she thereafter kept to the starboard side of the channel. Being the privileged vessel, she was not obliged to change her course. Actually it would have been improper for her to change before she backed, for such action would have been inconsistent with her signals at a time when she had no reason to suppose the "Fort Ash" would not assent to

them. The "Brimstone's" failure to have a lookout did not contribute to the accident, for those in charge of her navigation saw the "Fort Ash" about a mile away; and since no whistles were sounded by the "Fort Ash," a lookout would have heard none.

 On the other hand, the "Fort Ash," having heard the "Brimstone's" signals, maneuvered inconsistently with them, without informing the "Brimstone" of her intentions. By failing to keep to starboard moreover, the "Fort Ash" violated the Narrow Channel Rule, art. 25 of the Inland Rules, 33 U.S.C.A. § 210. The width of the channel at the point of collision was about 750 feet, and navigation in it was therefore governed by the Narrow Channel Rule. The Portchester, 2 Cir., 94 F.2d 644, 645; The Trim, D.C.Mass., 30 F.Supp. 283, 285, affirmed General Seafoods Corp. v. J. S. Packard Dredging Co., 1 Cir., 120 F.2d 117.[1] Finally the "Fort Ash," although the burdened vessel, sought to enter the channel between the Brother Islands at too great a rate of speed. Gatewood v. Sanders, 4 Cir., 152 F.2d 379. The court found that when she left the northerly channel she had a speed of about nine knots an hour. For a minute and a half before the collision her engines had been going astern, but she was making no sternway. On the contrary, she was still making about five knots headway at the time of the collision. Informed of the "Brimstone's" intentions, having the choice of two channels, and being the more maneuverable vessel, the "Fort Ash" had the last opportunity to avoid the accident. But as the pilot of the "Fort Ash" testified, he wished to pass the ammunition ship "Ferncliffe," without going too close to her. Therefore, although it was customary for vessels of the "Fort Ash's" tonnage to take the northerly channel, especially when the southerly channel was being used, he turned into his portside of the southerly channel at a high rate of speed and made the collision inevitable. Then, after the collision, he continued on with enough speed to succeed in his maneuver and cut in ahead of the "Ferncliffe" on emerging from the southerly channel.

Affirmed.

---

[1] The Hygrade No. 12 v. The Talisman, 2 Cir., 153 F.2d 52, City of New York v. American Export Lines, 2 Cir., 131 F.2d 902, and The Wrestler, 2 Cir., 232 F. 448, which declare the East River not to be a narrow channel, are not in point here, for the collisions there involved occurred in the lower part of the East River, where it is not divided by islands and hence is much wider than the channel in which the collision here involved occurred. Indeed in The Wrestler, supra, 232 F. at 450, it is intimated that navigation around Blackwell's Island, the point nearest the mouth of the River at which a narrowing of the channel occurs, may be governed by the Narrow Channel Rule.